UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

**MAR 16 2016**

ARTHUR JOHNSTON
BY_____ DEPUTY

UNITED STATES OF AMERICA, *ex rel*:
GWENDOLYN PORTER                                    **PLAINTIFF**

V.                                    CIVIL ACTION NO.: 1:16-cv-75  HSO-JCG

CENTENE CORPORATION, and
MAGNOLIA HEALTHPLAN, INC.                          **DEFENDANTS**

<u>**FIRST AMENDED COMPLAINT FOR DAMAGES
AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT**</u>

<u>**FILED UNDER SEAL—PROCESS TO BE WHTHELD UNTIL FURTHER
ORDER OF THE COURT**</u>

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff, United States of America, *ex rel*: Gwendolyn Porter, as Relator,

by and through counsel, states as follows:

### INTRODUCTION

1.      This is an action brought by plaintiff, the United States of America

(United States or Government), by and through the relator, Gwendolyn Porter

(Ms. Porter) to recover treble damages and civil penalties under the False Claims

Act 31 USC §§3729 – 3733 (FCA), and to recover damages under the common

law theories of payment by mistake, unjust enrichment, and breach of the duty of

good faith and fair dealing from defendants Centene Corporation,[1] and Magnolia

HealthPlan, Inc.

---

[1] In the relator's race to the courthouse, undersigned counsel, in the Original Complaint, inadvertently named the wrong entity, Centene Management Company, LLC. According to Dunn and Bradstreet, Centene Management Company, LLC no longer exists.

2.     The FCA provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, submits or causes to be submitted a false or fraudulent claim to the United States Government for payment or approval is liable for a civil penalty of up to $11,000 for each claim, plus three times the amount of the damages sustained because of the false claim. The FCA allows any person having knowledge of a false or fraudulent claim against the United States to bring an action for herself and for the United States, and to share in any recovery. The party bringing the action is known as a "relator" and the action that a relator brings is called a *qui tam* action.

3      Relator, Gwendolyn Porter, files this action on behalf of the United States pursuant to the *qui tam* provisions of the FCA, 31 USC §3730 (b) (1).

4.     From February, 2011 through the present (the "relevant period") Centene Corporation, and its wholly owned subsidiaries in the states named below (collectively, Centene) knowingly, systematically and illegally billed Medicaid through the state administrative agencies for services rendered by purported "Case Managers" or "Care Managers"[2] (CM's) who, in fact, were not properly licensed in the states to act as such.

5.     Centene is one of the largest Medicaid providers in the country. According to its latest figures, Centene works with over 5.1 million members across 23[3] states, delivering health care locally.[4]

---

[2] Centene uses these terms interchangeably.
[3] This total does not include Centene's newest subsidiary, Nebraska Total Care, approved in February 2016 to begin operating a CCO in Nebraska.
[4] See the latest Centene Corporation Press Release that includes the Reports for 2015 Fourth Quarter and Full Year Results attached hereto as "Exhibit A".

6.     Centene, through its individual state subsidiaries, currently operates in the states of Arizona, Arkansas, California, Florida, Georgia, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, Ohio, Oregon, South Carolina, Tennessee, Texas, Vermont, Washington, and Wisconsin.[5]

7.     Magnolia HealthPlan, Inc.[6] is the wholly owned subsidiary of Centene which operates in the state of Mississippi, one of the most impoverished states in the Union and, correspondingly, one of the states whose citizens are the most dependent upon Medicaid.

8.     Throughout the relevant period, Centene knowingly, or with willful blindness or reckless disregard for the truth, represented that all of its Case Managers, subsequently referred to as "Care Managers", in Mississippi were either properly licensed Registered Nurses (RN's) or Licensed and registered Social Workers.[7] Instead, many of the CM's were not and are not licensed Registered Nurses nor licensed and registered Social Workers, but were, instead, Licensed Practical Nurses (LPN's) not meeting the minimum legal requirements as set forth by the Mississippi Board of Nursing, and not as represented to the Mississippi Division of Medicaid, or to the state Medicaid recipients by Centene.[8]

---

[5] Soon to be included in this list is the state of Nebraska.
[6] Since Centene Corporation operated in Mississippi exclusively through its wholly owned subsidiary, Magnolia HealthPlan, Inc., and all of the fraudulent conduct perpetrated by the named defendants was perpetrated through the state subsidiary, both companies acted at all times as one. For brevity's sake, Centene Corporation and Magnolia Health Plan, Inc. will be referred to collectively as "Centene".
[7] The social worker degree referred to must be a four-year degree from an accredited college.
[8] While the legal requirements for CM's may vary from state to state, it is believed that, in all likelihood, this fraud was, and is, widespread.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this First Amended Complaint pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a).  The Court has personal jurisdiction over the defendants because the defendants reside in and/or transact business within the Southern Division of the United States District Court for the Southern District of Mississippi.

10.     Under the False Claims Act, this First Amended Complaint, like the Original Complaint before it, is to be filed *in camera* and remain under seal for a period of at least sixty (60) days and shall not be served on the defendants until the Court so orders.  The Government may elect to intervene and proceed with the action within sixty (60) days after it receives both the First Amended Complaint and the material evidence and information.

11.     This action is not based upon any public disclosure of information within the meaning of 31 U.S.C. § 3730(e)(4)(A).  The Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), derived through her employment and/or contacts with Centene/Magnolia, and her own investigations of the information on which the allegations set forth in this Complaint are based.  Relator has voluntarily provided this information to the Government prior to filing the Original Complete or this first Amendedt Complaint. To the extent any of these allegations may have been publicly disclosed, within

4

the meaning of 31 U.S.C. § 3730(e)(4)(A), the relator was the source of the disclosures.[9]

## PARTIES TO THE ACTION

12.     Relator, Gwendolyn Porter, a citizen of the United States and a resident of Grenada, Mississippi, is suing on behalf of and in the name of the United States of America and on behalf of herself personally.  Mrs. Porter is a duly licensed Registered Nurse (RN) in the state of Mississippi.[10] Mrs. Porter was employed from February of 2011 to September of 2012 with Magnolia HealthPlan, Inc.  During her tenure with Centene/Magnolia, Mrs. Porter worked as a Case Manager.

13.     Defendant Centene Company is a Fortune 500 Company.  Even though Centene Corporation is doing billions of dollars of business in the state of Mississippi,[11] it is not registered to do business this state, and the Mississippi Secretary of State has no record of any registered agent for service of process in the state.  Centene Corporation's principal Place of business is 7700 forsyth Blvd, St. Louis, Missouri, 63105.

14.     Defendant Magnolia HealthPlan, Inc. is a wholly owned subsidiary of Centene Corporation which was created to operate and which is operating within the state of Mississippi so as to deliver certain specified services and

---

[9] In late 2011 or early 2012, relator sent two anonymous letters (approximately a month apart) to the Division informing them of the illegal practices of Centene.  Fearful of retaliatory conduct, relator actually drove to Jackson to mail both letters, so as to leave no clue as to her whereabouts, and handled them with cloth gloves so as not to leave any fingerprints. Neither of these letters produced any results.
[10] A copy of the documents certifying that Mrs. Porter is a Registered Nurse from the Mississippi Board of Nursing is attached hereto as "Exhibit B".
[11] See a copy of Centene Corporation's latest Press Release reporting the 2015 Fourth Quarter and Full Year Results, including the operations in Mississippi, attached hereto as "Exhibit A".

products through Medicaid. Magnolia may be served with process through its registered agent for service, C T Corporation System of Mississippi, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

## BACKGROUND

15.     Medicaid is a government program for persons of all ages whose income and resources are insufficient to pay for health care.  It is the largest source of funding for medical and health-related services for people with low income in the United States. It is a means-tested program that is jointly funded by the state and federal governments and managed by the states, with each state currently having broad leeway to determine who is eligible and for implementation of the program.

16.     Each state determines eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 CFR §§430.0 – 430.30 (1994). The federal share of Medicaid expenditures varies by state and can fluctuate annually.[12]

17.     Mississippi, like many states, does not implement the entire Medicaid program directly, but outsources most of that implementation to outside companies that it deems qualified to do so.   These companies are in the business of providing prepaid comprehensive health care services as defined in 42 CFR Sec. 438.2.  These outside companies are known as "Coordinated Care

_____

[12] This federal participation in the monies reimbursed to Medicaid recipients, either directly or indirectly, necessarily involves federal dollars - thus subjecting the perpetrators of any fraud on that system to the penalties and consequences imposed by the federal False Claims Act.

Organizations", or "CCO's".  This legislation was implemented in Mississippi on January 1, 2011, creating a coordinated care program for targeted individuals. In Mississippi this program is known as "Mississippi Coordinated Care Network" or "MississippiCAN" (hereafter, MSCAN)

18.   MSCAN includes Medicaid services and products in all 82 counties in Mississippi.  A Program Summary of the MSCAN Program is attached hereto as "Exhibit C".

19.   Periodically, any company which has been prequalified by the state of Mississippi,[13] is allowed to submit a bid, or Proposal, on what it would charge to provide those comprehensive health care services in accordance with the contractual terms as set forth by MSCAN.

20.   Those served by Medicaid are among the least educated or least advantaged citizens of the state.  As a result, and in an effort to protect those intended recipients, the Division[14] has placed strict and rigorous compliance standards upon those seeking to bid on the MSCAN Contracts.  Additionally, the MSCAN Contracts themselves impose strict and rigorous compliance standards. As a result, only two organizations have ever been able to qualify as Coordinated Care Organizations (CCO's) in Mississippi, and thereby participate in the Mississippi Coordinated Access Network.    Those two organizations are: **UnitedHealthcare Community Plan, Inc.** a wholly owned subsidiary of **UnitedHealth Group, Incorporated** and **Magnolia HealthPlan, Inc.** a wholly

---

[13] In order to be eligible to bid on a Contract, the bidding entity must first be an entity eligible to enter into a full risk capitated contract in accordance with Section1903(m) of the Social Security Act and 42 CFR sec. 438.6(b), and be engaged in the business of providing prepaid comprehensive health care services as defined in 42 CFR sec. 438.2.
[14] "Division" refers to the State of Mississippi, Office of the Governor, Division of Medicaid.

owned subsidiary of **Centene Corporation**.

21.     Those citizens of Mississippi who are eligible to participate in MSCAN, referred to as "Beneficiaries", are those that receive Medicaid through:

      A.     Supplemental Security Income;

      B.     DHS Foster Care Children;

      C.     Disabled Children living at home;

      D.     The Working Disabled;

      E.     Those who have contracted breast or cervical cancer;

      F.     Pregnant women and infants;

      G.     Family/children participating in TANF (Temporary Assistance for Needy Families); and

      H.     All newborns.

22.     If a citizen of Mississippi is a Medicaid recipient over the age of nineteen (19) in any of the categories listed above, then enrollment in one of the two CCO's, in Mississippi, either UnitedHealthcare Community Plan or Magnolia HealthPlan, is mandatory.  If the Medicaid recipient does not choose one or the other plan in which to enroll, one will be chosen for him/her by the state.

23.     As a result, these two CCO's in Mississippi enjoy a duopoly with respect to the delivery of and payment for certain Medicaid services and products.

24.     Essentially, these two CCO's operate as do private insurance companies would with respect to the administration of claims and services, except that the funds being administered are not private funds; they are federal

Medicaid funds.

25.     As reflected on "Exhibit D" to this First Amended Complaint, both CCO's have grown substantially since they were established.  As of December of 2015, the latest date for which counsel has been able to obtain data, Magnolia, through Centene, serves 249,045 Mississippians on a monthly basis.

26.     Examples of those services and products for which the CCO's are paid are:

A.     Physician office visits;

B.     Durable medical equipment;

C.     Vision care;

d.     Dental care;

E.     Physical and other forms of therapy;

F.     Hospice;

G.     Pharmacy needs;

H.     Mental health services;

i.     Certain outpatient hospital services such as chemotherapy, emergency room visits, and x-rays.

J.     Inpatient services.[15]

27.     As compensation for these services, CCO's receive a monthly per Member[16] capitation[17] rate, similar to an insurance premium, depending both

---

[15] This latest category of services, inpatient services, was only recently added.  See the Centene Corporation Press Release previously referred to and attached hereto as "Exhibit A"
[16] A "Member" is a Medicaid Beneficiary under MSCAN who has chosen or been assigned to one of the two CCO's.
[17] "Capitation Rates" are contractually agreed upon monthly rates that MSCAN pays the CCO for each Beneficiary who is a Member of that CCO during that particular month.

upon the probable medical needs of that particular Member and the region of the state in which the Member resides. An example of the capitation rate schedule in effect in Mississippi is attached as "Exhibit E".[18]

28.   As a consequence of being awarded one of the two contracts available in the state of Mississippi, Centene agreed to abide by and strictly comply with the contractual requirements as specified by MSCAN.

## CONTRACT REQUIREMENTS

29.   Centene has been successful in being awarded multiple successive contracts between it and MSCAN. The first, a copy of which is attached hereto as "Exhibit F", commenced on November 1, 2010, with an original termination date of December 31, 2013. This Contract was apparently renegotiated, amended, and extended. The second Contract, as amended, is attached hereto as "Exhibit G".

30.   The third consecutive Contract, a copy of which is attached hereto as "Exhibit H", commenced on July 1, 2014, and is set to terminate on June 31, 2017.[19]

31.   The operative contractual obligations, and the representations made by Centene, regarding Case or Care Managers are essentially identical in all contracts.

32.   Specifically, all three contracts include "reliance" language that

---

[18] The rate schedule attached as "Exhibit E" to this First Amended Complaint is the one that was in effect in Mississippi in 2013. This rate schedule is subject to change every year.

[19] At the time the Original Complaint was filed, undersigned counsel did not have a copy of this third Contract. The provisions in this third Contract do not in any way adversely affect the claims made in the Original Complaint. If anything, the terms of this third contract strengthen the United States claims against Centene.

states:

> Whereas, the Division desires to contract with a Coordinated Care Organization (Contractor) to obtain services for the benefit of certain Medicaid beneficiaries and the Contractor has provided to the Division continuing proof of the Contractor's ... **capability to provide quality services efficiently, effectively and economically during the term of this Contract, upon which the Division relies in entering into this Contract.** [20]

(Emphasis added)

33.    Each contract includes identical language in their respective Sections regarding compliance with **State and Federal Law,** which states:

> At all times during the term of this Contract and in the performance of every aspect of this Contract, the **Contractor shall strictly adhere to all applicable federal and state law (statutory and case law), regulations and standards, as have been or may hereinafter be established, specifically including without limitation, the policies, rules, and regulations of the Division.** [21]

(Emphasis added)

34.    All contracts include identical language in their respective Sections dealing with **Contractor Representations**, the operative language of which state:

> The Contractor hereby **represents and warrants to the Division that:**
>
> .......
>
> c.    **All of the information and statements contained in the MississippiCAN Contract Proposal and responses to additional letter inquiries** submitted by the Contractor to the Division **are true and correct as of the date of this Contract.**
>
> .......
>
> h.    **All covered services provided by the Contractor will meet the quality management standards of the**

---

[20] In the first two Contracts, Exhibits "F" and "G" this language is found on page 2 of each contract. In the third contract, Exhibit "H," this language is found on page 7.
[21] "Exhibit F", p. 3; "Exhibit G", p. 3; "Exhibit H", p. 9.

**Division,** and will be furnished to Enrollees as promptly as necessary to meet each individual's needs.[22]

(Emphasis added)

35.    All contracts include almost identical[23] language in the respective

Sections dealing with **Division Policies and Procedures** which state:

**The Contractor shall comply with all applicable policies and procedures of the Division, specifically, including without limitation all policies and procedures applicable to each category of Covered Services for the MississippiCAN program which are also covered by the State Plan**, all of which are hereby incorporated into this Contract by reference and form an integral part of this Contract.

(Emphasis added)

36.    All contracts include almost identical[24] language in their respective

Sections dealing with **Administration, Management, Facilities, and**

**Resources:**

The **Contractor shall maintain** at all times during the term of this Contract **adequate staffing**, . . . sufficient to serve the needs of Enrollees, **as specified in this Contract, RFP Proposal, and in accordance with appropriate standards of both specialty and sub-specialty care.**

(Emphasis added)

37.    All Contracts include Sections specifically addressing case[25]

management needs as follows:

---

[22] "Exhibit F", p. 4 - 5; "Exhibit G", p.4; "Exhibit H", p. 10 - 11.

[23] The quoted language can be found in Sections 1.9 of the first two contracts ("Exhibit F", p. 9; "Exhibit G", p. 10).  The language included in the third contract, found in Section 1(K), though modified somewhat, is not materially different ("Exhibit H", p. 17).

[24] The quoted language can be found in Sections 1.10 of the first two contracts ("Exhibit F", p. 10; "Exhibit G", p. 11).  The language included in the third contract, found in Section 1(L), though modified somewhat, is not materially different ("Exhibit H", p. 18).

[25] In the third contract, the word "case" is changed to "care", but as will be demonstrated, this is a distinction without a difference.

. . . . **Medical Management staffing shall be at a level that is sufficient to perform all necessary medical assessments and to meet all Mississippi Medicaid Enrollees' case management needs at all times.**[26]

(Emphasis added).

38.     Moreover, the first two contracts go on to state:

The following are the minimum qualifications for staff and level of equipment:

. . . .

i.     **Designated staff, qualified by training and experience, to be responsible for Enrollee Services**.....[27]

(Emphasis added).

39.     The Third Contract, "Exhibit H", does not include the above quoted "qualified by training and experience" language in the Section dealing with Administration, Management, Facilities and Resources.[28]  Instead, the language used in the third Contract is more specific.  It states:

The Contractor shall also have the following staff located in Mississippi, at a minimum:

. . . . .

**Sufficient medical management staffing to perform all necessary medical assessments and to meet all MississippiCAN Members' Care Management needs at all times**...[29]

(Emphasis added).

40.     All Contracts include provisions that include strict compliance standards regarding the content and truthfulness of marketing of services and

---

[26] The quoted language can be found in Sections 1.10 of the first two contracts ("Exhibit F", p. 10; "Exhibit G", p. 11).  The operative language found in the third contract, in Section L, though modified somewhat by changing the word "case" to "care", is not materially different ("Exhibit H", p. 20).

[27] This language is found in Sections 1.10 of the first two contracts ("Exhibit F", p. 12; "Exhibit G", p. 12).  It is not found in the third contract.

[28] In the third contract, the section dealing with Administration, Management, Facilities and Resources is Section 1(L).

[29] This language is found in Section 1(L)(5) of the third contract ("Exhibit H", p. 20).

products by Centene.  In fact, Centene is precluded from marketing to targeted beneficiaries who are not already enrolled as Members with Centene.  All distribution of marketing materials to these targeted, and as yet unaffiliated, Enrollees[30] is to be done by the Division itself.  However, Centene is affirmatively tasked with the responsibility of developing the marketing materials that are to be distributed to these unaffiliated Enrollees by the Division.  In doing so, the Sections dealing with **Marketing**, provide:

> The **Contractor shall develop marketing materials** such as written brochures and fact sheets which comply with the information requirements set forth herein. **Marketing plans and materials shall not mislead, confuse, or defraud the Enrollees or the Division.**
>
> . . . . .
>
> **Marketing and promotional activities (including provider promotional activities) must comply with all relevant Federal and State laws . . . .**[31]

(Emphasis added)

41.    All Contracts provides that the Contractor (Centene) may distribute marketing materials to Medicaid beneficiaries where the beneficiary is currently enrolled with the Contractor.[32]

42.    Expressly included in all Contracts is a section dealing with **Prohibited Marketing and Outreach Activities**; these in pertinent part state:

> The following are **prohibited** marketing and outreach activities targeting prospective enrollees under this Contract:
>
>> i.    Engaging in any informal or marketing activities

---

[30] An "Enrollee" is the same as a "Member".
[31] The quoted language is from Sections 4.15 of the first two Contracts ("Exhibit F", p. 31; "Exhibit G", p. 32).  Similar language is found in Section 6(H) of the third contract.  Although the language in the third contract is not identical, it is not materially different from the language quoted ("Exhibit H", p. 60 – 61).
[32] "Exhibit F", p. 32; "Exhibit G", p. 33; "Exhibit H", p. 61 – 62.

**which could mislead, confuse, or defraud enrollees or misrepresent the division. (42 CFR §438.104)[33] [34]**

(Emphasis added)

## "CASE MANAGEMENT"

43.     In order to take care of Members who have chronic or special health care needs,[35] MSCAN requires that the Contractor establish a **"Case"** or **"Care" Management Program**.

44.     The first two Contracts used the phrase "Case Management". In the third Contract, the phrase was changed to "Care Management".

45.     The first two Contract do not define the phrase "Case Management". However, "Case Management" was defined by Centene itself, in 2011 as, "a coordinated set of activities conducted for individual patient management of serious, complicated, protracted or other health conditions."[36]

46.     The minimum services to be performed by the Case Management system are set forth in Sections 5.8 of the first two Contracts. These identical Sections specify that the Contractor (Centene) shall be responsible for the management and continuity of medical care for all those enrolled in the Case Management Program. A list of those minimum functions for a Case Management Program are specified in both Contracts as follows:

---

[33] "Exhibit F", p. 33; "Exhibit G", p. 34; "Exhibit. H", p. 62 – 63.

[34] As will be shown subsequently in this Complaint, the defendants' conduct violates not only the Division Contracts attached hereto, but also constitutes prohibited conduct under the federal regulations instituted by Congress regarding the truthfulness of marketing materials, both as to the intended beneficiaries and to the states.

[35] Examples of such chronic or special health care needs are Cancer, Multiple Sclerosis, Kidney Disease, HIV/Aids, Congestive heart disease, Sickle Cell Anemia, Hypertension, Organ Transplants and a multitude of other complex medical conditions.

[36] See the Definitions Section on page 16 of Centene's Policy and Procedure Handbook from 2010 – 2011, attached hereto as "Exhibit I".

a.     Ensuring continuity of care by scheduling all routine visits with the beneficiary's chosen health care provider;[37]

b.     Appropriate referral and scheduling assistance for Enrollees needing specialty health care services, including those identified through EPSDT;[38]

c.     Documentation of referral services and medically indicated follow-up care in each Enrollees's medical record; [39]

d.     Monitoring and treatment of Enrollees with ongoing medical conditions according to appropriate standards of medical practice;[40]

e.     Documentation in each medical record of all urgent care, emergency encounters and any medically indicated follow-up care.[41]

f.     Coordination of hospital discharge planning;[42]

g.     Determination of the need for non – covered services and referral of Enrollees to the appropriate service setting, utilizing assistance as needed from the Division.[43]

h.     Coordination with other health and social programs such as Individuals with Disabilities Education Act (IDEA), Part B and Part C; the Special Supplemental Food Program for Women,

---

[37] "Exhibit F", p. 43; "Exhibit G", p. 44.
[38] "Exhibit F", p. 44; "Exhibit G", p. 44.   "EPSDT" stands for "Early and Periodic Screening, Diagnosis and Treatment Services".
[39] "Exhibit F", p. 44; "Exhibit G", p. 44.
[40] Id.
[41] Id.
[42] Id.
[43] Id.

Infants, and Children (WIC); Head Start; school health services, and other programs for children with special health care needs, such as the Title V Maternal and Child Health Program.[44]

i.  Ensuring that Enrollees are entitled to the full range of their health care providers' opinions and counsel about the availability of medically necessary services under the provisions of the Contract. This includes advising Enrollees about any contractual provisions, including gag clauses or rules that restrict a healthcare provider's ability to advise patients about medically necessary treatment options that violate federal law and regulations.[45]

j.  Ensuring that Medicaid providers are not limited in their scope of practice, as defined by federal and state law, in providing services to Plan Enrollees.[46]

k.  Ensuring that, when a provider is no longer available through the Plan, the Contractor allows enrollees who are undergoing an active course of treatment to have continued access to that provider for a limited period of time.[47]

l.  The Contractor shall provide for a second opinion from a qualified healthcare professional within the network, or

---

[44] Id.
[45] Id.
[46] Id.
[47] Id.

arrange for the Enrollee to obtain one outside the network, at

no cost to the Enrollee.[48]

m.      If the Network is unable to provide necessary medical

services covered under the contract to a particular Enrollee,

the Contractor must adequately and timely cover the

services out of network for the Enrollee, for as long as

the Contractor is unable to provide them. The out of network

providers must coordinate with the Contractor with respect to

payment.[49]

n.      The Contractor must produce a treatment plan for Enrollees

determined to need a course of treatment or regular care

monitoring. The treatment must be developed by the

Enrollee's primary care provider with Enrollee participation,

and in consultation with any specialist caring for the

Enrollee.[50] [51]

### "CARE MANAGEMENT"

47.      The phrase "Case Management" cannot be found anywhere

in the third Contract.[52]   Instead, the phrase is changed to "Care Management",

---

[48] "Exhibit F", p. 44; "Exhibit G", p. 45.

[49] "Exhibit F", p. 45; "Exhibit G", p. 45.

[50] Id.

[51] The renegotiated contract, "Exhibit G", included an additional Section 5.8(o) which provided that the Contractor would complete Health Risk Screenings on all new members and complete an update to the Health Risk Assessment every two years on members enrolled in complex case management.

[52] This does not appear to be a serendipitous slip of the tongue. The change of the word "Case" to "Care", accompanied by the verbose, yet meaningless, accompanying definition appears as a pathetic attempt to avoid the consequences of using LPN's in positions for which they are not qualified.

and it is defined in the third Contract as:

> A set of Member-centered, goal oriented, culturally relevant, and logical steps to assure that a Member receives needed services in a supportive, effective, efficient, timely, and cost-effective manner.[53]

48.     A review of the Section in the third Contract dealing with "Care Management" reveals that the contracting parties intended no lessening of the duties and responsibilities to be assumed by the "Manager", regardless of whether he/she is referred to as a "Case" or "Care" Manager.  In discussing the "Care Manager's" responsibilities, the third Contract states:

> The Care Manager must contact the Member **via telephone or face-to-face interview** to assess the Member's Care Management needs. **This detailed health risk assessment must evaluate the Member's medical condition(s), including physical, behavioral, social and psychological needs**.[54]

(Emphasis added).

## THE ROLE OF THE CASE MANAGER

49.     In order to effectively provide the services unique to each Member facing his or her complex medical or behavioral problem, as required by MSCAN, the Contractor (Centene) is obligated to assign each such Enrollee a Case Manager or (CM) who is responsible for attending to that Enrollee's special complex medical or behavioral needs.

50.     For those Members who are experiencing complex medical issues, Centene is required to assign a Registered Nurse (RN) as their Case Manager.

51.     According to Centene's own Policy and Procedure Manual, Case

---

[53] "Exhibit H", p. 22.
[54] "Exhibit H". p. 90.

Managers must be RN's.[55]

52.  For those Members who are experiencing complex behavioral health issues, such as mental illness, Centene may assign either an RN or a licensed Social Worker,[56] or both, as their Case Manager.[57]

53.  The vast majority of these Case Management services are performed telephonically.[58]

54.  In no event, is Centene to assign a Case Manager who is neither a Registered Nurse nor a licensed Social Worker.

**RELATOR IS A FORMER CASE MANAGER EMPLOYED BY CENTENE**

55.  Gwendolyn Porter, the relator herein, was employed as a Case Manager for Centene from February 2011 to September 2012.  Mrs. Porter was, and is, a Registered Nurse, licensed by the Mississippi Board of Nursing.[59]

56.  During her employment with Centene, Mrs. Porter possessed actual knowledge of the practices of Centene whereby Centene, instead of utilizing the services of RN's to act as Case Managers, knowingly and intentionally employed much less expensive LPN's to serve as Case Managers.[60]

57.  This practice of utilizing less expensive LPN's to serve as Case Managers began as early as February of 2011 and continues to this day.[61]

---

[55] See the "Policy" excerpt from the Centene Policy and Procedure Manual (page 1) attached hereto as "Exhibit J".  See also the Job Description listed on Centene's website for Mississippi positions under "Supervisor, Case Management" attached hereto as "Exhibit K".
[56] These Social Workers must hold a Bachelor's Degree or its equivalent, and be properly licensed in the state.
[57] See Affidavit of Gwendolyn Porter attached hereto as "Exhibit L".
[58] The relevance of this fact will become obvious later in this First Amended Complaint.
[59] Id.
[60] Id.
[61] Id.

## CASE MANAGEMENT IS NOT WITHIN THE
## SCOPE OF PRACTICE OF AN LPN IN MISSISSIPPI

58.    The scope of practice of Registered Nurses (RN's) versus Licensed Practical Nurses (LPN's)[62] is governed by the Board of Nursing of each individual state.

59.    In Mississippi, like most other states, the state Board of Nursing has determined that neither Case Management nor telephonic case referrals are within the scope of practice of a Licensed Practical Nurse.  Such practices are, instead, within the scope of practice of a Registered Nurse.

60.    More specifically, the Mississippi Board of Nursing website expressly addresses the issue of whether an LPN may legally engage in the decision-laden practice of Case Management.    On this website, there is a section covering "Frequently Asked Questions."  Question number 93 deals with the subject of Telenursing, and states as follows:

**Telenursing**

Is (sic) telephonic case referrals and telephonic case management within the scope of practice of the LPN?

**Telephonic case referrals and case management (on site and telephonic) are not within the scope and practice of the licensed practical nurse in Mississippi.**  They are within the scope and practice of the registered nurse.[63]

(Emphasis added)

61.    Accordingly, in order to serve as a Case or Care Manager in administering the services set forth by MSCAN regarding complex medical

---

[62] California and Texas, both of which are states in which Centene operates, refer to LPN's as LVN's, Licensed Vocational Nurses.
[63] See "Exhibit M" to this Complaint.

diseases in the Contracts with Centene, the Case or Care Manager must be an RN. An LPN is simply not one who is, "qualified by training and experience, to be responsible for Enrollee Services"[64] in the state of Mississippi.

62.     Likewise, an LPN is not one who is legally allowed to:

> ... contact the Member via telephone or face-to-face interview to assess the Member's Care Management needs. This detailed health risk assessment must evaluate the Member's medical condition(s), including physical, behavioral, social and psychological needs.[65]

63.     Further, using LPN's to serve as Case Managers violates the adequate staffing requirements of the provisions of all three Contracts, which state:

> The **Contractor shall maintain** at all times during the term of this Contract **adequate staffing**, . . . sufficient to serve the needs of Enrollees, **as specified in this Contract, RFP Proposal, and in accordance with appropriate standards of both specialty and sub-specialty care.**[66]

(Emphasis added)

### FEDERAL REGULATIONS REGARDING THE TRUTHFULNESS OF MARKETING MATERIALS FOR MEDICAID SERVICES

64.     Federal Regulations require that the marketing materials of an entity such as Centene be "accurate, and [do] not mislead or confuse or defraud the Beneficiaries or the State agency."[67]

### MISREPRESENTATIONS INCLUDED IN MARKETING MATERIALS

---

[64] See the language in sections 1.10(i) of the first two contracts quoted in paragraph 38 above.
[65] See the language in Section 8 (A)(1) in the third contract, ("Exhibit H", p. 90).
[66] The quoted language can be found in Sections 1.10 of the first two contracts ("Exhibit F", p. 10; "Exhibit G", p. 11). The language included in the third contract, found in Section 1(L), though modified somewhat, is not materially different ("Exhibit H", p. 18).
[67] 42 CFR 438.104(b)(2).

65.    Being cognizant that, for complex medical diseases or complex behavioral diseases, only RN's or licensed social workers may serve as Case or Care Managers, Centene has, nevertheless, knowingly and intentionally misrepresented the qualifications of some of its Case or Care Managers both to the Division and to the Beneficiaries or Members.

66.    On page 44 of the Magnolia HealthPlan Handbook (2015), prepared by Centene, a copy of which is attached as "Exhibit N", in the Section which addresses "Care Management",[68] Centene states:

> **Care Management**
> We understand some members have special needs. In those cases, Magnolia offers our members care management services to assist our members with special healthcare needs.  If you have special healthcare needs or you have a disability, care management may be able to help you.  **Our case managers are registered nurses or social workers.**  They can help you understand major health problems and arrange care with your providers.  A **case manager** will work with you and your provider to help you get the care you need.  This service is for members who have complex medical conditions.

(Emphasis added).

67.    This Handbook is distributed to every Medicaid Beneficiary in Mississippi who either choses Magnolia as its CCO, or is assigned to Magnolia by the state.[69]

68.    In presentations made to the public, as reflected by the Power Point presentation used in August of 2013, a copy of which is attached as "Exhibit O", Centene states:

---

[68] While Centene has now changed the word "Case" to "Care", the description of the services clearly refers to "case managers", and clearly refers to complex medical conditions requiring the services of a registered nurse, services far beyond the expertise of the LPN.

[69] As a result, this material misrepresentation has been made to every Member of Magnolia HealthPlan by Centene.

### Case Management

- Case Management is available to all members
- **Case Managers are registered nurses** that help members with more complex medical conditions like: Sickle Cell, Multiple Sclerosis, Kidney Disease, and HIV/AIDS
- These members often have several providers
- Members may need help at home or treatment supplies

(Emphasis added)

69.    Nowhere, in any of its promotional material has Centene ever revealed the fact, either to the Division or to the Members, that it has been, and is using LPN's to serve as Case or Care Managers. Instead, with the full knowledge that the LPN's were acting as Case or Care Managers, and thereby acting illegally, Centene billed Medicaid for their services.

### CENTENE'S USE OF LPN'S AS CASE MANAGERS

70.    In violation of State law, and contrary to the representations made both to the District and to the Medicaid beneficiaries whom it serves, Centene has, from its first delivery of Medicaid services in 2011, employed several LPN's in Mississippi,[70] and most probably in other states, to serve as Case or Care Managers.

71.    Specifically, Centene has employed in Mississippi: Jamie Aguillar in the Gulf Coast Region; Ron Waddell in the Jackson Region; Vicky Savell in the Yazoo Region; and Karen Carpenter McKellar in the Delta Region to serve as

---

[70] See Affidavit of Gwendolyn Porter attached hereto as "Exhibit L".

24

Case managers.  Even though each of the above named individuals have served as Case Managers for Centene, none of them were, or are RN's; nor are any of them licensed social workers.  Instead, each of them hold only held an LPN degree.[71]

72.     Indeed, their immediate supervisor, who should have also been at least an RN, if not a physician, was herself only an LPN.  Her name is Cherie Polk, and she resided, at the time, in the Jackson District.[72]

## DAMAGES
## (The Fraud is Baked in the Cake)

73.     The primary difference between an RN and an LPN is one of training and education.  This additional training and education is designed to develop in the RN greater critical thinking skills than that of the lesser trained and educated LPN.

74.     Obviously, Mississippi, like most other states, has deemed the enhanced critical thinking skills presumably possessed by one who holds an RN degree to be absolutely necessary and critical when that individual is placed in the largely autonomous, and decision-filled position of Case or Care Manager.

75.     This practice of using unqualified LPN's to serve as Case or Care Managers, has been utilized by Centene in Mississippi continuously since February of 2011.  The damages that have been sustained by the recipients of Medicaid who suffer from complex medical conditions and have had their cases managed by an unqualified LPN are, at this time, undeterminable; and perhaps,

---

[71] Id.
[72] It was known that Ms. Polk still occupied that position as recently as mid 2015.  In all likelihood, she retains that position to this day.

in some cases, even catastrophic.[73]

76.    Not surprisingly, one who possesses an RN degree commands a greater salary, as a rule, than one who possesses only an LPN degree.

77.    In other words, by hiring unqualified LPN's to serve as Case Managers, and misrepresenting such Case Managers as being properly qualified RN's, Centene has cut corners, and saved itself money – money saved at the expense of the quality of care provided to Mississippian recipients of Medicaid.[74]

78.    Centene, like other CCO's, does not charge Medicaid or the Division directly for the services rendered to the *individual* beneficiaries by the Case or Care Managers.  Instead, those services are essential benefits that are available to all participants in the MSCAN program, and lie at the very heart of the Coordinated Care Network system.[75] The charges for Case or Care Managers services are *therefore built into, and form an integral part of, the capitated rates which are paid to Centene monthly.*  Such Case or Care Management costs are therefore, essential base costs, which must be taken into account when arriving at a figure that would reasonably compensate Centene for such services through the capitated rates negotiated between the Division and Centene.

---

[73] This lawsuit does not seek to recover on behalf of those who have been damaged by having an unqualified, and misrepresented, Case or Care Manager assigned to their case.  Such causes of action, if they exist, belong to the injured individual beneficiary.

[74] Apparently cutting costs by engaging in illegal business practices involving nurses is part of the Centene business plan.  See *Clark et al. v. Centene Corporation et al.*, case no. 1:12-cv-00174 in the United States District Court for the Western District of Texas (Conditionally certified class action against Centene for failure to pay nurse employees overtime).

[75] One of the underlying reasons for the creation of the Mississippi Coordinated Care Program was to utilize outside vendors who, through their expertise, could coordinate Members benefits, improve efficiencies in the system, and advise the beneficiaries how best they could navigate the maze we know as the medical system in this country.

79.    In Mississippi, as in most other states, parties who desire to enter into a contract owe each other a "Duty of Good Faith and Fair Dealing" in their negotiations.  This duty essentially gives each party the legal right to rely upon the truthfulness of the representations made by the other in their negotiations.

80.    In addition, the contract itself, as previously quoted in this First Amended Complaint, required Centene to employ staff who were legally qualified in the State of Mississippi to serve as Case or Care Managers.

81.    MSCAN was entitled to assume that the people Centene intended to hire, and ultimately hired, to fill the positions of Case or Care Manager would be, at the very least, legally qualified to do so by education and experience. It also stands to reason that MSCAN would be justified in its assumption that these purportedly qualified individuals would be costly to employ, and would therefore justify higher capitated rates by Centene in order to compensate Centene for the higher labor costs.

82.    By hiring unqualified and thereby less expensive employees to fill these necessary positions, Centene has fraudulently, and materially misrepresented, both to the Division and to the recipients, not only the capability of the individuals to perform such services, but also has materially misrepresented the underlying costs that have actually been incurred by Centene to supply those purported services.

83.    These misrepresented costs formed a portion of the underlying data used by both Centene and the District in their negotiations to arrive at mutually agreeable capitated rates for serving Mississippians receiving

Medicaid.  The problem, of course, is that Centene actually knew at the time it made its proposal to the Division that the underlying costs would be assumed by the District to be higher than they actually were.  The District, on the other hand, because it assumed that Centene's employees would actually be "qualified", was under the misimpression that Centene's underlying costs were and would continue to be higher than Centene actually incurred.

84.   As a result of these misrepresentations, the capitated rates paid to Centene by MSCAN have been fraudulently inflated.[76]  The great majority of these fraudulently inflated payments have been reimbursed by the United States Government through the Medicaid program.

85.   Accordingly, due to the nature of the capitated rate system for payment to Centene, *all* capitated rate payments made to Centene by MSCAN from February, 2011 to the present, constitute "False claims" within the meaning of the FCA.  This is true regardless of whether a beneficiary's Case or Care Manager was an RN or an LPN; or whether the particular beneficiary even participated in the case management program.  The reason that each and every capitated payment was fraudulent was that the underlying data, which formed the basis for all of the capitated rates, was fraudulently inflated.

86.   Alternatively, each and every capitated rate payment made for a Beneficiary who was served by a Case or Care Manager who was neither a Registered Nurse nor a licensed social worker constituted a false claim under the

---

[76] To put the fraud in terms familiar to the legal profession, it is the equivalent of charging a staff attorney's rates for a paralegal's work.

meaning of the FCA.[77]

## THE FALSE CLAIMS ACT

87.    The FCA provides for the award of treble damages and civil

penalties for, *inter alia*, knowingly causing the submission of false or fraudulent

claims for payment to the United States, or knowingly using a false record or

statement material to get false claims paid by the United States, 31 USC §3729

(a)(1)(A), (B) and (C) (2009). The FCA provides that any person who:

> (A) knowingly presents, or causes to be presented, a false
> or fraudulent claim for payment or approval; [or]
> (B) knowingly makes, uses, or causes to be made or used a
> false record or statement material to a false or fraudulent
> claim; [or]
> (C) conspires to commit a violation of subparagraphs (A),
> (B), (D), (E), (F), or (G);
> .... Is liable to the United States government for a civil
> penalty of not less than $5,000 and not more than $10,000
> as adjusted by the Federal Civil Penalties Inflation
> Adjustment Act of 1990, [citation omitted] plus 3 times the
> amount of damages which the Government sustained
> because of the act of that person . . .
>                          .....
> (b) For the purposes of this section - -
>          (1) the terms "knowing" and "knowingly" --
>                   (A) mean that a person, with respect to
>                   information –
>                            (i) has actual knowledge of the
>                            information;
>                            (ii) acts in deliberate ignorance of
>                            the truth or falsity of the
>                            information; or
>                            (iii) acts in reckless disregard of
>                            the truth or falsity of the
>                            information; and
>                   (B) require no proof of specific intent to
>                   defraud.

31 USC §3729 (a), (b).

---

[77] According to the relator who previously served as a Case Manager for Centene, the Case Managers average servicing approximately one hundred Medicaid beneficiaries each per month, and aspired to a goal of servicing 200 each per month.

88.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Bill Collection Improvements Act of 1996, 28 USC §2461 (notes), and 64 Fed. Reg. 47099, *47103 (1999), the civil penalties were adjusted to not less than $5,500 and no more than $11,000 for the violations occurring on or after September 29, 1999. See also 28 CFR §85.3(a)(9) (detailing current civil penalties of not less than $5,500 and not more than $11,000 for violations of the FCA).

## VIOLATION OF THE FALSE CLAIMS ACT

### COUNT I: False or Fraudulent Claims

**Violation of the False Claims Act, 31 U.S.C. sec. 3729(a)(1)(A)**

89.     Providers such as Centene, who participate in the Medicaid program, submit for payment the claims for services rendered to recipients to designated agencies within the respective states.   In Mississippi, that state agency is, and has been, MSCAN. As this First Amended Complaint has demonstrated, since 2011, Centene has repeatedly submitted and/or caused the submission of false claims for capitated rate payments based, at least in part, upon case management services purportedly provided to Medicaid recipients by persons falsely represented to be either RN's or licensed social workers.

90.     Centene knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for monthly capitated payments whose underlying costs had been misrepresented to the Division due to the fact that Centene employed unqualified, cheaper, LPN's to act as Case or Care Managers instead of the

more expensive RN's as required by state law. Centene fraudulently misrepresented, both to the Division and to the recipients, not only the capability of the individuals to perform such services, but also has materially misrepresented the underlying costs that have been incurred by Centene to supply those purported services.   These misrepresentations to the Division, influenced the perception of the costs incurred by Centene resulting in fraudulently inflated capitated rates.  As a result, all capitated payments made to Centene since the inception of the fraud, February of 2011, are False Claims within the meaning of the FCA.

91.    Alternatively, Centene knowingly presented, or caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States, including claims for monthly capitated payments on behalf of Centene Medicaid Beneficiaries who were undergoing Case or Care Management, but whose Case or Care Managers had been misrepresented as being Registered Nurses or licensed social workers when in fact, they were not.

92.    This conduct constitutes willful conduct on behalf of defendants in violation of the False Claims Act, 31 U.S.C. sec. 3729 *et seq.* in that each and every claim for a capitated payment for a beneficiary or member being served by an alleged "Case Manager" who is neither a Registered Nurse nor a qualified Social Worker, constitutes a "False Claim" within the meaning of the act.

93.    By virtue of the false or fraudulent claims presented or caused to be presented by the defendants, the United States has suffered damages.

94.    Defendants are liable to the United States for treble damages under

the FCA in an amount to be determined at trial, plus a civil penalty of no less than $5,500, and no more than $11,000 for each false claim presented, or caused to be presented, by defendants.

## COUNT II: False Statements

### Violation of the False Claims Act 31 U.S.C. sec. 3729(a)(1)(B)

95.     Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. sec. 3729(a)(1)(B), as amended on May 20, 2009.

96.     Defendants are liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of no less than $5,500, and no more than $11,000, for each false claim presented or caused to be presented by defendants.

## COUNT III: Unjust Enrichment

97.     This is a claim for the recovery of monies by which the defendants have been unjustly enriched.

98.     By directly or indirectly obtaining government funds to which it was not entitled, defendants were unjustly enriched, and are liable to account for and pay to the United States Government such amounts, or the proceeds therefrom, which are to be determined at trial.

## COUNT IV: Payment by Mistake

99.     This is a claim for the recovery of monies paid by the United States to Centene as a result of mistaken understandings of fact.  Centene received and

retained the benefit of these monies.

100.    The claims which defendants submitted or caused to be submitted to the United States were paid by the United States based upon mistaken or erroneous understandings of material fact.

101.    The United States, acting in reasonable reliance on the truthfulness of the claims and truthfulness of defendants, paid Centene certain sums of money to which Centene was not entitled.  Defendants are thus liable to account for and to repay to the United States Government such amounts, which are to be determined at trial.

## COUNT V: Breach of Contract

### Additional Sanctions Available Through the Contract

102.    In addition to the causes of action specified above, defendants actions as described above constitute breaches of the contracts between the Contractor (Centene) and the Division.

103.    The United States, through the Department of Health and Human Services, as the provider of the Medicaid funds, is a third party beneficiary of those the contracts between Centene and the Division, and has suffered damages as a result of the actions of the defendants.

104.    In addition to the FCA damages specified in Paragraphs 73 through 86 of this First Amended Complaint, All three contracts provide for additional sanctions for marketing violations.   These sections provide for fines in the

amount of twenty-five thousand dollars ($25,000.00) for each marketing violation in connection with each audit or investigation.[78]

105.   The misrepresentations that the Case Managers were either RN's or licensed social workers, when in fact some of them were not, constitute violations of the Marketing provisions in all three contracts.

106.   Accordingly, with respect to each member in the Case Management Program in which the Case or Care Manager serving that member was neither a registered nurse nor a licensed social worker, the Division and/or the United States as third party beneficiary, is/are entitled to additional damages for marketing violations in the amount of $25,000. per marketing violation.

## COUNT VI: Breach of the Covenant of Good Faith and Fair Dealing

107.   The United States, through the Department of Health and Human Services, as the provider of the Medicaid funds used to fund the contracts, is a third party beneficiary of those the contracts between Centene and the Division.

108.   At all times prior to the execution of all three contracts with the Division, Centene misrepresented the qualifications, and correspondingly the costs, of those employees it intended to hire as Case or Care Managers.  These misrepresentations constituted breaches of the Duty of Good Faith and Fair Dealing.

109.   As a result of these breaches of the Duty of Good Faith and Fair Dealing, the United States Government has been damaged.

---

[78] "Ex. F", p. 85; "Ex. G", p. 85; "Ex. H", p. 132.

110.   As a breach of the Duty of Good Faith and Fair Dealing, not only is the Government entitled to actual damages, but is also entitled to the imposition of punitive damages to discourage such conduct in the future.

**COUNT VII: Relator's Entitlement to Participation**
**in United States' Recovery Pursuant to 31 U.S.C. sec. 3730(d)**

111.   Gwendolyn Porter, a former employee of Centene, and the relator herein, voluntarily provided information of the false claims and their nature to the United States Attorney for the Southern District of Mississippi prior to the filing of this Complaint.

112.   This information was not publicly known prior to the revelation of the false claims by the relator herein.

113.   The relator also furnished documents and other material evidence to the United States Attorney regarding the false claims and misrepresentations made by the defendants, including emails and other internal documentation.

114.   In addition, since the Relator was at all material times a Registered Nurse, and one who was properly qualified in the State of Mississippi to serve as a Case Manager, she did not participate in the fraudulent scheme perpetrated by Centene.

115.   Furthermore, this Complaint, prepared by counsel for relator with the assistance of the relator, thoroughly examines the intricate and complicated capitation rate system and the underlying fraud, yet at the same time, sets forth the false claims and their nature in a simple and straightforward manner, allowing the United States to quickly, thoroughly and efficiently investigate these false

claims and prosecute this action, both in the state of Mississippi, and in the other states in which Centene operates.

116. Accordingly, the *Qui Tam* Plaintiff, relator herein, should be awarded the maximum amount allowed pursuant to section 3730(d) of the False Claims Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America, *ex rel*: Gwendolyn Porter, and Gwendolyn Porter individually, request that judgment be entered in their favor and against defendants as follows:

1. That process be issued requiring the defendants named herein to answer fully the allegations contained in this complaint;

2. That on the First and Second Counts under the False Claims Act for the amount of the United States damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

3. On the Third Count, for unjust enrichment, for the amounts by which the defendants were unjustly enriched in an amount to be determined, together with costs and interest, and for all such further relief as may be just and proper.

4. On the Fourth Count for payment by mistake, for the amounts of the monies defendants received to which they were not entitled, plus interest, costs, and expenses, and all such further relief as may be just and proper in an amount to be determined.

5.      On the Fifth Count for breach of contract, for the amounts of liquidated damages as called for in the Contracts for each marketing violation as determined by the Court.

6.      On the Sixth Count for breach of the Duty of Good Faith and Fair Dealing, for all such damages as determined by the Court, including the imposition of punitive damages.

7.      On the Seventh Count, that the *qui tam* Plaintiff/relator be awarded the maximum amount allowed pursuant to section 3730(d) of the Federal Civil False Claims Act;

8.      With respect to each count, interest, attorney's fees and costs as allowed by law and any and all further relief as the Court deems just and proper.

9.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States of America, *ex rel*: Gwendolyn Porter, and Gwendolyn Porter, individually as Relator, hereby demand trial by jury.

**RESPECTFULLY SUBMITTED** this the 15 day of March, 2016.

                          **UNITED STATES OF AMERICA, *ex rel*:**
                          **GWENDOLYN PORTER**

                          **Gwendolyn Porter, Relator**

37



**OF COUNSEL:**

C. W. Walker III
C. W. Walker III, LLC
512 Main Street
Greenville, MS 38702-0841
Phone: 662.820.0070
Email: bill@bill-walker.com
MSB# 6870


Darnell Pratt, II
Simmons & Simmons, PLLC
207 Main Street
P. O. Box 1854
Greenville, MS 38702-1854
Phone: 662.334.1666
Fax: 662.334.1665
Email: dpratt@simmonspllc.com
MSB# 104682


**STATE OF MISSISSIPPI**
**COUNTY OF GRENADA**

**PERSONALLY CAME AND APPEARED BEFORE ME,** the undersigned authority in and for the jurisdiction aforesaid, the within named Gwendolyn Porter, who stated on her oath that the facts and matters contained in the above and foregoing document are true and correct as therein stated, and that with respect to those stated on information and belief, the undersigned Gwendolyn Porter verily believes such representations to be true and correct as stated herein.

**SWORN TO AND SUBSCRIBED BEFORE ME** on this the 15th day of March, 2016.

Katie a Fowler
Notary Public

STATE OF MISSISSIPPI
KATIE A. FOWLER
ID No
94406
NOTARY PUBLIC
Comm Expires
October 9, 2018
GRENADA COUNTY

38

My Commission Expires:

Oct. 9, 2018

**OF COUNSEL:**

C. W. Walker III
C. W. Walker III, LLC
512 Main Street
Greenville, MS 38702-0841
Phone: 662.820.0070
Email: bill@bill-walker.com
MSB# 6870

Darnell Pratt, II
Simmons & Simmons, PLLC
207 Main Street
P. O. Box 1854
Greenville, MS 38702-1854
Phone: 662.334.1666
Fax: 662.334.1665
Email: dpratt@simmonspllc.com
MSB# 104682